Botsford, J.
The plaintiff, Exxon Corporation (Exxon), seeks specific performance of an option to purchase real estate contained in a lease of real property in Waltham, Massachusetts. Exxon entered into the lease in 1971 with the predecessors in title to the defendant, M. Claire McManus, (McManus) who is the current property owner.[1] McManus contends that because the option to purchase vests more than twenty-one years after its creation, it violates the rule against perpetuities and is therefore void.
The case is before the court on cross motions for summary judgment. There are no disputed issues of fact, and the sole legal issue presented is whether the rule against perpetuities applies to the option contained in the leases in question. For the following reasons, Exxon’s motion for summary judgment is ALLOWED, and McManus’ cross motion for summary judgment is DENIED.
BACKGROUND
The undisputed facts are as follows. In May of 1971, McManus’ parents, Thomas F. and Blanche G. McManus,[2] and Exxon’s predecessor, Humble Oil & Refining Company,[3] entered into a lease containing an option to buy certain real estate located on Main Street in Waltham (the property).[4] The lease, commencing on October 1, 1971, was for twenty years and included one five-year extension. Exxon made a timely election to continue the lease for the extension period, and accordingly, the lease ran until September 30, 1996. Paragraph thirteen of the lease contains an option to buy the property for a fixed price of $160,000. The paragraph reads in pertinent part as follows:
(13) [The lessors], in consideration of this lease, hereby grant to Lessee the option to purchase the property herein demised for the sum of One Hundred Sixty Thousand Dollars ($160,000) within ninety (90) days after the renewal period upon Lessee delivering to Thomas F. and Blanche G. McManus at 247 State Road, Wayland written notice of intention to do so or by mailing such notice by registered mail addressed as aforesaid at least two days before the expiration date of the original term or any renewal thereof, and such notice, if so mailed, shall be deemed valid and effective whether or not the same in fact is actually delivered to the Lessor. In the event of the exercise of this option, the purchase price shall be paid in cash or by Lessee’s check upon the transfer and conveyance to Lessee or its nominee by a good and sufficient quitclaim deed, a good and marketable title to said premises free and clear of all liens and encumbrances ... The deed shall be delivered and the title closed on the thirtieth (30th) day after giving notice of exercise of this option . . . unless the date of the closing is subsequently extended by mutual agreement . . .
(Lease, ¶13. See Affidavit of R. Allen Brandt, Exhibit A.)
At various times during the lease term, Exxon has operated a gasoline service station which is located partly on the property and partly on adjoining land owned by Exxon. Exxon paid all rental amounts due under the lease during the original lease term and the extension period.
In 1994, Exxon sent a letter to McManus informing her of its intention to undertake a modernization project that would entail building a new gasoline station on the property, and to exercise the purchase option before the expiration of the lease. Exxon also noted in the letter that it continued to reserve its right to withdraw its intention of exercising the option. In the following year, Exxon spent over $1,000,000 to construct a gasoline service station, part of which was *203 located on the leased property and part on land already owned by Exxon. After completing the modernization project on the property, Exxon sent another letter on October 30, 1995 to McManus, indicating its intention of exercising the purchase option in the lease and indeed suggesting that the purchase not wait until the end of the lease term.
On August 27, 1996, Exxon sent a third letter to McManus, formally notifying her of its exercise of the option pursuant to paragraph thirteen of the lease, and setting a closing date thirty days later, on September 26, 1996. On or about September 4, 1996, McManus’s counsel informed Exxon that McManus did not consider herself bound to sell the property since the option was void under the rule against perpetuities. On September 26, 1996, the closing date previously designated, Exxon was ready, willing and able to purchase the leased property for the specified $ 160,000, but McManus did not appear at the closing.
DISCUSSION
As stated at the outset, the major issue raised by the summary judgment motions is whether the common law rule against perpetuities applies to options contained in long-term leases and specifically the commercial lease between Exxon and McManus.[5] The common law rule against perpetuities states that “no interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest.” J.C. Gray, The Rule against Perpetuities, §201, at 191 (4th ed. 1942).
The Supreme Judicial Court has held that an option in “gross," that is, an option not annexed to any other document, are subject to the rule. Certified Corp. v. GTE Products Corp., 392 Mass. 821, 824-26 (1984) (options in gross, which bind the successors and assigns of each party, create a contingent equitable interest in the option holder that is subject to the rule against perpetuities). The court, however, has not expressly held that the rule against perpetuities applies to options contained in leases (sometimes referred to as “options appurtenant”), and in particular, to options appurtenant that are part of commercial leases like the present one. Indeed, as Exxon points out, the Supreme Judicial Court has stated in dicta that options appurtenant “might well be outside the scope of the rule against perpetuities.” Certified Corp. v. GTE Products Corp., supra, 392 Mass. at 823-24 n.5, citing Eastman Marble Co. v. Vermont Marble Co., 236 Mass. 138, 156 (1920). See also Certified Corp., 392 Mass. at 823 n.4.
The principal purpose of the rule against perpetuities is to prevent excessive restraints or limitations on the alienation of real property. See id at 825. Courts in a majority of other jurisdictions have held that the rule does not apply to options appurtenant in commercial leases.[6] Many of these courts have concluded that an option appurtenant in a commercial lease actually furthers the purpose of the rule, because the option to buy encourages full development of the property — a course of events that benefits all concerned and that also enhances the property's future marketability. See, e.g., Texaco Refining and Marketing, Inc. v. Samowitz, 213 Conn. 676, 570 A.2d at 174 (“[a]n option coupled with a long-term commercial lease is consistent with [the] policy objectives [of the rule against perpetuities] because it stimulates improvement of the property and thus renders it more rather than less marketable”); Citgo Petroleum Corp. v. Hopper, 245 Va. 363, 365-66 (1993) (agreeing that an option to purchase in a lease “stimulates improvement of the property and fosters full use thereof by the lessee,” to the benefit of the lessor, lessee and community).[7] McManus, however, contends that the option puts a cloud on the owner’s fee interest in the remainder after the lease. That may be true, but the owner was the person who agreed to the cloud, and more important, as the decisions cited just above indicate, options appurtenant provide an incentive for the tenant to develop the property since there is an opportunity to own it in the future. See Friedman on Leases, §15.101 (3rd edition 1990); Restatement of Property, §395 (1944); 6 American Law of Property, §24.57 (A.J. Casner ed. 1952). In this case, the record shows that Exxon modernized the property, spending a significant amount of money in the process, in the belief that it had the right to own the property at the end of the lease. One may reasonably infer that without such an option, Exxon would not have undertaken these development efforts during the lease term since the investment would revert back to the original owner at the end of the lease.[8]
Despite the opinions of American courts in support of Exxon’s position, McManus contends that the English common law should constitute the leading authority for Massachusetts courts to follow because American real estate law has historically relied upon it. English common law holds that “[a]n option to a tenant for years to purchase the fee, exercisable at a remote time, is bad as violating the Rule against Perpetuities.” J.C. Gray, The Rule against Perpetuities, supra at §230.3. Although the English common law is generally a relevant source of authority, it is not enough to compel a conclusion here that the rule applies to options appurtenant in commercial leases.[9] When applying the rule against perpetuities in a different commercial context, the Supreme Judicial Court stated that:
“Certainly our function is not to interpret the rule so as to create commercial anomalies . . . [T]he parties to . . . [common business arrangements] do not suspect that the rule will be extended to invalidate their agreements . . . We therefore do not propose to apply the rule in the rigid or remorseless manner . . . , instead we shall seek to interpret it reasonably, in the light of its objectives and the economic conditions of modem society . . .” Docu *204 ments should be interpreted, if possible, so as to avoid the conclusion that they violate the rule against perpetuities.
Childs v. Sherman, 351 Mass. 450, 455 (1966), quoting Wong v. DiGrazia, 60 Cal. ed 525, 533-34.
In sum, I agree with the reasoning of the authorities and the judicial decisions from other American jurisdictions cited above which have concluded the rule against perpetuities should not be applied to options to purchase contained in commercial leases, because the purposes the rule is designed to serve are not furthered by its application in this context. Accordingly, and in view of the fact that the issue appears somewhat open in Massachusetts,[10] I conclude that the rule does not invalidate the option to purchase contained in the lease between the parties here.
McManus argues that quite apart from the rule against perpetuities, Exxon failed to exercise the option in accordance with its terms because Exxon set the closing date on September 26, 1996, before the renewal period ended. Therefore, the argument goes, Exxon has no right to the benefit of the option. I disagree.
The pertinent language in the lease concerning the method of exercising the option to purchase is as follows:
[The lessors] . . . grant to Lessee the option to purchase the property herein demised . . . within ninety (90) days after the renewal period upon Lessee delivering to [the lessors] . . . written notice of intention so to do or by mailing such notice by registered mail ... at least two days before the expiration date of the original term or any renewal thereof. . . the deed shall be delivered, and the title closed on the thirtieth (30th day after the giving of notice of exercise of this option . . . unless the date of the closing is subsequently extended by mutual agreement.
(Emphasis supplied.) (Lease, ¶13. See Affidavit of R. Allen Brandt, exhibit A.)
The facts here show that Exxon sent written notice to McManus of its intent to exercise the option to purchase in a letter dated August 27, 1996, and in that letter set the closing date for September 26, 1996.[11] The lease term ended on September 30, 1996. Accordingly, Exxon’s written notice complied with the express terms of the option because it was sent at least two days before the extension period of the lease ended, and the closing was to take place on the thirtieth day after notice was given. McManus’ claim that the language of the lease requires the purchase of the property to take place only 'within the ninety days following the end of the extended lease period— i.e., during the ninety-day period following September 30, 1996 — fails to consider the specific provisions in the lease governing when notice of the option’s exercise is to be sent, and when the closing is to take place in relation to the notice date.[12] The claim must be rejected.
Exxon is entitled to specific performance with respect to its option to purchase. Specific performance of real estate agreements are appropriate unless there are specific equitable reasons for refusing such relief. Raynor v. Russell, 353 Mass. 366, 367-68 (1967). No such reasons exist here.
McManus assets that if she will be required to convey title to Exxon, Exxon should be required to pay her rent for the period between September 30, 1996, the end of the lease term, and the date of conveyance. She further claims that the rent to be paid should be set at current fair market value, and not the rent that Exxon was paying under the lease. There appears to be no basis to impose a rental obligation on Exxon at this time. As discussed above, Exxon took all proper steps to exercise its option and stood ready, willing and able to pay the purchase price set in the lease in exchange for the transfer of title on a date — September 26, 1996 — slightly before the lease term ended. The only reason the sale did not go forward at that time was that McManus refused to do so. If the transaction had proceeded on the schedule Exxon proposed, there would be no continuing rental obligation because Exxon would have been the property’s owner at the end of the lease, and Exxon was current on its rent through to that end point. McManus is not entitled to a reward for her erroneous refusal to comply with the terms of the parties’ lease agreement. Title to the property is to be transferred to Exxon upon its tender of the full purchase price, and no additional rent need be paid.
ORDER
For the foregoing reasons, the plaintiff motion for summary judgment is ALLOWED, and the defendant’s cross motion for summary judgment is DENIED. On or before April 8, 1997, the parties are to file, jointly if possible, a proposed form of judgment that provides for the transfer of title to the property.

 McManus owns the property in her capacity as trustee of the M. Claire McManus Trust No. 2.

 McManus’ parents held title to the property, and executed the lease, in their capacities as trustees of Wayland Associates, a trust created in 1951.

 For ease of reference, the lessee in the lease will be referred to only as Exxon.

 The lease appears to be a form document, preprinted with blanks to be filled in appropriate places with the relevant specific information such as, e.g., the name and address of the property owner(s) as lessor(s), a description of the leased property, the lease term, and the rent to be paid. In the lease at issue here, the specific information in these spaces has been typed in. Although the lease was apparently drafted by Exxon’s predecessor, Humble Oil, and although McManus asserts that Humble had greater bargaining power than her parents as lessors, she does not argue that her parents executed the lease under duress or in coercive circumstances.

 General Laws c. 184A, §1, enacted by St. 1989, c. 668, §1 and effective June 30, 1990, provides a statutory rule against perpetuities which states in pertinent part:
(a) A nonvested property interest is invalid unless:
(1) when the interest is created, it is certain to vest or terminate no later than twenty-one years after the death of an individual then alive; or
(2) the interest either vests or terminates within ninety years after its creation.
The parties here agree that this statutoiy rule against perpetuities is inapplicable in this case because the option was created before 1990, and the quoted statutory rule is applied prospectively only.

 See, e.g., Camerlo v. Howard Johnson Co., 545 F.Sup. 395, 397 (W.D. Pa. 1982), aff'd on this point, 710 F.2d 987 (3rd Cir. 1983); Dozier v. Troy Drive-in-Theaters, Inc., 265 Ala. 93, 89 So.2d 537, 545, 547 (1956); Roemer v. Sinclair Ref. Co., 151 Colo. 401, 380 P.2d 56, 59 (1963); Texaco Refining & Marketing, Inc. v. Samowitz, 213 Conn. 676, 570 A.2d 170, 173-74 (1990); St. Regis Paper Co. v. Brown, 247 Ga. 361, 365-66 (1981); Keough v. Peck, 316 Ill. 318, 147 N.E. 266, 272 (1925); Hollander v. Central Metal Co., 109 Md. 131, 71 A. 442, 448-48 (1908); Poland Coal Co. v. Hillman Coal & Coke Co., 357 Pa. 535, 540-41, 544 (1947); Citgo Petroleum Corp. v. Hopper, 245 Va. 363, 365-66 (1993); In re Ferguson, 751 P.2d 1008, 1011 (Colo.App. 1987); Wing, Inc. v. Arnold, 107 So.2d 765, 769 (Fla.App. 1958). But see First Huntington Nat’l Bank v. Gideou Bros. Realty Co., 139 W.Va. 130, 147 (1933).
Other sources support the majority view. See, e.g., Restatement of Property §395 (1944); 6 American Law of Property §24.57 (A. Casner ed. 1952); Leach Perpetuities in a Nutshell, 51 Harv.L.Rev. 638, 661 (1938) 2 Friedman on Leases § 15.101 (3rd edition 1990). See also W.Va. Code §36.1-24 (1957) (statutory recognition of option in lease exclusion); Ala. Code §35-4-76.

 See also St. Regis Paper Co. v. Brown, supra, 247 Ga. at 362:
The wisdom and legal logic, however, for extending the rule [against perpetuities’] applicability to a commercial setting is at best questionable. In today’s world of complex and sophisticated real estate dealings, it is important that we do not broaden the rule against perpetuities to the point that its effect will be the opposite of its intended purpose. The rule came into being in order to control family property transfers which limited the rights of certain generations to alienate the property. Therefore, the thrust of the rule is to encourage the right of free dealings in real estate interest. To apply the rule to options contained in leases could very well have a reverse effect. Neither lives in being nor twenty-one years has any relevance to the commercial situation. This is particularly true when the holder of the beneficial interest in the property is able to utilize and develop his interest to its fullest, as is the case of a lessee who holds an option to purchase a leasehold (citation omitted).

 McManus argues that the equities are not in Exxon’s favor here because even while investing money in its modernization product, Exxon always retained the right to decline the option — it was wholly up to Exxon to decide whether an ultimate purchase would make commercial sense, and, if not, to return the property to McManus who would be obliged to accept it. Nevertheless, even if this were to occur, McManus would be receiving back a property in substantially improved condition that presumably would have a greater market value than before the improvements were made.

 England has changed by statute the application of the common law rule to options contained in leases. 33 Halsbury’s Statutes of England & Wales, Perpetuities and Accumulations Act of 1964, §9 (4th ed., 1993 reissue).

 See Certified Corp. v. GTE Products Corp., 392 Mass. 821, 823-24 n.5 (1984), quoted on p.5 above.

 There is no dispute that the letter was sent by registered mail, return receipt requested, or that it was received by McManus. Nor is there disagreement that Exxon has tendered the full option price of $160,000.00.

 It appears that the provision concerning the ninety days sets an outside limit for when the purchase is to take place.